IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


**JOHNNY W. GARR, SR.,**          )
                                  )
      Plaintiff,          )
                                  )
   v.                          )
                                  )
**UNION PACIFIC RAILROAD,**       )          No. 10 C 5407
                                  )
      Defendant.          )
                                  )
                                  )


## MEMORANDUM OPINION AND ORDER

Johnny W. Garr, Sr., filed a seven-count first amended
complaint alleging that defendant Union Pacific Railroad
discriminated against him on the basis of race, age, and
disability in violation of the Illinois Human Rights Act, 775
ILCS 5/1-101 *et seq.* ("IHRA"), counts I-III.[1]  Garr also alleges
that defendant discriminated against him on the basis of race in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§ 2000e *et seq.* (count IV), on the basis of age in violation of
the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621
*et seq.* (count V), and on the basis of actual and perceived
disability in violation of the Americans with Disabilities Act,

---

[1]  On June 20, 2011, the Garr Bankruptcy Estate, as represented
by trustee Philip Leavy, was substituted as the plaintiff in this
case.  For the sake of simplicity, however, I refer to Garr as
"plaintiff" in this opinion.

1

42 U.S.C. § 12101 *et seq.* (counts VI-VII).  Defendant moves for summary judgment on all claims and to bar plaintiff's expert Dr. Jeffrey Coe.  For the following reasons, defendant's motion for summary judgment is granted in part and denied in part and the motion to bar is denied.

I.

The following facts are undisputed.  Johnny W. Garr, Sr. ("Garr") is a 63-year-old, African American male.  Garr was hired by Chicago and North Western Railroad ("C&NW") in 1970.  In 1995, Union Pacific acquired C&NW, and in 1998 Garr became a Thru Freight Engineer, or locomotive engineer.  As a locomotive engineer, Garr operated a freight train that weighed 3,000 tons or more at speeds up to 40 miles per hour.

In November 1998, Garr had a heart attack and was diagnosed with coronary artery disease.  Shortly afterward, he underwent triple bypass surgery.  Garr returned to work as a locomotive engineer in February 1999.  Based on Garr's condition, his treating cardiologist, Dr. Lowell Steen, began to recommend embedding an implantable cardiac defibrillator ("ICD") in 2006 or 2007.  On August 13, 2008, Garr underwent surgery to have an ICD implanted.  An ICD constantly monitors heart rhythm with electronic counters that determine the heart rate based on the number of impulses that it sees over a unit of time.  If the counters exceed a programmed value, the device can intervene with

either rapid pacing to terminate an arrhythmia or a shock to restore the normal rhythm.

Garr was released for temporary productive work ("TPW") by Dr. John Charbonneau, Associate Medical Director for defendant, on September 3, 2008, and he began work the following day. The TPW program is designed to bring employees back to their regular jobs within 30 to 60 days. On September 10, 2008, Dr. Joseph Cytron, the electrophysicist and cardiologist who performed the operation to implant the ICD, released Garr to return to work without restrictions. On September 11, 2008, Dr. Charbonneau indicated to Lauren Bond, an Occupational Health Nurse for defendant, that he needed more information, including "the diagnostic study results and clinic notes that preceded the implantation, and the post-implantation clinic notes, as well as the first AICD interrogation report" before he could consider returning Garr to his regular position as a locomotive engineer. (Def.'s Ex. 7a). At Dr. Charbonneau's behest, on September 16, 2008, Bond contacted Dr. Steen, Garr's cardiologist, requesting additional information and records. Independently of the request, on September 16, 2008, Dr. Steen also released Garr to return to work full duty and without restrictions as of September 21, 2008.

Dr. Charbonneau received the requested additional information on September 24, 2008. The information indicated

that Garr's last reported ejection faction ("EF") measure,
meaning the amount of blood pumping through the heart, was 15%.
A normal EF is between 50% and 60%.  The additional information
also indicated that Garr was experiencing non-sustained
ventricular tachycardia, meaning abnormal electrical impulses in
the lower chamber of the heart.  Based on this information, Dr.
Charbonneau determined that Garr was not fit to return to his
position as a locomotive engineer.  At that time, Garr's TPW
status was terminated.

At Dr. Charbonneau's direction, Bond had also requested
post-implantation ICD data.  On September 30, 2008, Bond received
the requested data, which indicated that Garr's ICD had recorded
25 instances of short non-sustained events, or types of
arrhythmias, since implantation.  Also, on that date Garr's EF
was measured at 20%.  Defendant cleared Garr to work with
restrictions on November 21, 2008.  The restrictions were (1) no
safety sensitive work; (2) no work in train service; and (3) work
in the light-medium category.

Dr. Charbonneau has testified that he spoke to Dr. Cytron on
October 14, 2008.  The conversation was purportedly memorialized
in a January 9, 2009, letter that Bond sent to Drs. Steen and
Cytron on behalf of Dr. Charbonneau.  During the phone
conversation, Dr. Charbonneau understood Dr. Cytron to have said
that Garr had an 8-10% risk of sudden incapacitation and was not

4

qualified to return to his former position under Department of Transportation/Federal Motor Carrier Safety Administration ("DOT/FMCSA") guidelines. Dr. Cytron does not recall having said this to Dr. Charbonneau and testified that the 8-10% risk of sudden incapacitation is for patients who do not have an ICD.

On October 29, 2008, and again on November 12, 2008, Garr was informed by Sheila Gniffke-Pribyl, Director of Disability Prevention and Management, that he was not qualified for train service or safety-sensitive jobs and that he would not be returned to his former position. During this time, Gniffke-Pribyl began looking into potential internal and external job options for Garr. There were no positions available within the company, and Garr did not respond to messages from an external placement services agency that Gniffke-Pribyl had contacted.

On December 12, 2008, and again on December 15, 2008, Dr. Steen once more sent letters releasing Garr for work without restrictions. The letters also noted that Garr's condition was at its "baseline" for the past 10 years, but it is undisputed that during those 10 years Garr's EF decreased from 30-35% in 1998 to 20% in 2008. Dr. Steen submitted another letter on December 22, 2008, again releasing Garr for work without restrictions. Garr was not returned to work.

On January 27, 2009, Garr filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the

5

U.S. Equal Employment Opportunity Commission ("EEOC").  The IDHR dismissed Garr's claims on February 19, 2010 and the EEOC issued a notice of right to sue on July 23, 2010.  Garr filed a first amended complaint in the Circuit Court of Cook County on August 24, 2010, and the case was removed to this court on August 26, 2010.

## II.

Summary judgment is granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). I must view all facts and reasonable inferences in the light most favorable to the nonmoving party.  *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010).  However, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505 (1986).

## III.

I begin by addressing defendant's argument that plaintiff's claims must be limited to events that took place on September 11, 2008.  An EEOC charge encompasses the claims in a complaint if the claims are "like or reasonably related to the allegations of the charge and growing out of such allegations." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (quoting

*Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167
(7th Cir.1976) (en banc)).  "This means that the EEOC charge and
the complaint must, at minimum, describe the *same conduct* and
implicate the *same individuals.*"  *Cheek*, 31 F.3d at 501 (emphasis
in original).  Here, the conduct at issue in both the charge and
the complaint is defendant's refusal to return Garr to his
position as a locomotive engineer.  The final decision to not
return Garr to work did not occur on September 11, 2008, but
rather in late November when Garr was released to work with
restrictions (those restrictions being no safety sensitive work
and no work in train service).  In other words, the ultimate
decision to not return Garr to his former position was not
independent from the alleged events of September 11, 2008, but
was made final in November 2008.  Because plaintiff's charge of
discrimination specifically alleges that he was not returned to
work for discriminatory reasons, he was not required to file a
new charge specifying the later date.

However, the scope of plaintiff's claims is limited for
another reason.  On summary judgment, plaintiff argues that
defendant continued to discriminate against him by failing to
return him to his former position in 2009 and 2010, even though
Dr. Steen released Garr to return to work on at least two more
occasions.  Specifically, plaintiff purports to rely on a June 3,
2009, letter in which Dr. Steen reported that Garr's EF measured

7

43% as of May 26, 2009. Plaintiff was not returned to work at this point, even though the 43% EF meant that Garr arguably met the Department of Transportation/Federal Motor Carrier Safety Administration ("DOT/FMCSA") guidelines, which defendant claims it adopted for purposes of determining when employees with cardiac conditions can return to work. But plaintiff failed to assert such a theory in his first amended complaint, which does not allege any facts beyond December 2008, even though it was not filed until August 24, 2010. Plaintiff offers no explanation for why these facts were not part of the complaint. Neither the facts nor the claims pleaded in the complaint can be fairly read to support the theory that defendant's later actions relate back to defendant's original refusal to return plaintiff to his former position, and plaintiff cannot amend his complaint by arguing otherwise in opposing summary judgment. *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008) (plaintiff may not amend his complaint by attempting to alter the factual basis for his claim through arguments in his brief in opposition to a motion for summary judgment). That plaintiff's EEOC charge alleges ongoing harassment is not enough to establish plaintiff's theory. Harassment and refusal to return to work are distinct claims. As such, plaintiff's claims are limited to defendant's original refusal to return Garr to work as a locomotive engineer in late October or November 2008.

8

A. Defendant's motion to bar

Defendant has moved to bar plaintiff's expert, Dr. Jeffrey Coe, and his report, on the grounds that his proffered testimony is beyond the scope of his expertise, contains factual errors and contradictions, and is in part irrelevant to plaintiff's claims. The admissibility of Dr. Coe's proposed expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

It is the proponent of the proffered expert testimony who bears the burden of establishing that the expert testimony is both reliable and relevant.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-91, 113 S.Ct. 2786 (1993).

To start, defendant is correct to point out that parts of Dr. Coe's proposed testimony would reach beyond his expertise. Dr. Coe specializes in occupational medicine and was a regional medical director for the Union Pacific from 1998 through 2002. He continues to conduct fitness-for-duty and return to work evaluations for the Union Pacific and professes a familiarity with the DOT/FMCSA guidelines.  However, Dr. Coe is not a cardiologist and is not qualified to interpret the raw data from Garr's ICD downloads or to opine on whether Garr has experienced arrhythmias.

To argue that Dr. Coe's proposed testimony must be barred in its entirety, however, is to overstate the case.  Defendant's reliance on *Lewis v. PDF Am., Inc.*, 532 F.Supp.2d 1006 (N.D. Ill. 2008) and *Muzzey v. Kerr-McGee Chem. Corp.*, 921 F.Supp. 511 (N.D. Ill. 1996) is, in this regard, misplaced.  In both of these cases the issue was whether the proffered experts were qualified to testify on the issue of causation.  Here, Dr. Coe's expert report is limited to his opinion regarding defendant's application of a set of medical standards as a guideline for conducting fitness-

for-duty evaluations.  Plaintiff has shown that Dr. Coe is qualified to make such an opinion.

Defendant's other arguments for barring Dr. Coe's report and testimony are similarly not persuasive.  The factual errors and alleged contradictions are not so great as to undercut the foundation for Dr. Coe's opinion and do not indicate that Dr. Coe failed to perform his due diligence.  *Woods v. Olin*, No. 00-CV-0962-DRH, 2002 WL 34371098 (S.D. Ill. July 9, 2002) is inapposite in this respect.  In that case the factual errors and theoretical conflicts were so egregious that the court found that all of the expert's opinions were based on inaccurate facts and the expert's theory was "a far cry" from the requirements of Rule 702.  *Id*. at 2-3.  Most of Dr. Coe's opinions are relevant to plaintiff's claims, even if those claims are limited to acts prior to December 2008.

B. ADA Claim

A plaintiff can prove disability discrimination under either the direct or indirect method of proof.  *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011), *reh'g denied* (Oct. 18, 2011), (citation omitted). Plaintiff has not submitted any direct evidence of discrimination and therefore must proceed under the burden-shifting indirect method.  Under the indirect method, a plaintiff must establish a prima facie case by showing that "(1) she is disabled within the

11

meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838-39 (7th Cir. 2012) (citation omitted). If a plaintiff establishes her prima facie case, the burden shifts to the defendant to "offer a legitimate nondiscriminatory reason for the employment decision." *Id.* at 839 (quoting *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005)). If the defendant satisfies its burden, the burden shifts back to the plaintiff, who must show that there is a genuine dispute that the defendant's reasons are a pretext for discrimination. *Id.* (citing *Nese*, 405 F.3d at 641).

    1.  Prima facie case

        a. Disability

With respect to the first prong of the prima facie case, the "ADA defines 'disability' as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 781 (7th Cir. 2007) (quoting 42 U.S.C. § 12102(2)).[2]  In opposition to summary

---

[2]  Though neither party has raised the issue in the summary judgment briefing, I note briefly that because plaintiff's complaint is limited to allegedly discriminatory actions that took place in 2008, I apply the law as it was before the ADA

judgment, plaintiff argues that Garr is disabled under the first and third prongs, though when pressed at oral argument, plaintiff's counsel conceded that he was not arguing that Garr was actually disabled.

Plaintiff has not produced evidence that his cardiac condition limits a major life activity. "[T]he existence of a medical condition alone is insufficient to satisfy the ADA." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 607 (7th Cir. 2012) (citing *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 198 (2002)). Plaintiff argued in his written response to summary judgment that Garr is actually disabled because he was substantially limited in the life activity of working. To be substantially limited in the life activity of working under § 12102(2)(A), an individual must be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Squibb*, 497 F.3d at 782. Plaintiff has argued vigorously, in his written response to summary judgment and at oral argument, that Garr's impairment does not prevent him from being able to perform his job as a locomotive engineer. Because

Amendments Act of 2008 ("ADAAA"), which took effect in January 1, 2009. The Seventh Circuit has consistently taken the view that the ADAAA is not retroactive. *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, and 22nd Judicial Circuits*, 601 F.3d 674, 679 n. 3 (7th Cir. 2010); *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 n. 1 (7th Cir. 2010).

13

plaintiff disclaims any limitation in Garr's ability to perform his job of locomotive engineer and does not present any evidence showing that he is substantially limited in his ability to perform any other job or class of jobs, he cannot maintain an argument that he is disabled under the first prong of the ADA's definition.

While plaintiff has not raised a genuine dispute as to whether he is actually disabled, he has shown that there is a question for trial as to whether defendant regarded him as being disabled under § 12102(2)(C). To succeed under this theory, plaintiff must present evidence that defendant "regarded him as limited in his ability to perform not merely one particular job but a class or broad range of jobs." *Miller v. Ill. Dept. of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011) (citations omitted). The relevant considerations in determining whether plaintiff has made such a showing include

> the nature and severity of the perceived impairment; the
> duration of the perceived impairment; and the permanent or
> long-term impact, or expected permanent or long-term impact,
> of the impairment. . . . Other factors specific to the
> major life activity of working include the geographical area
> to which the person has reasonable access; "the job from
> which the individual has been disqualified because of an
> impairment, and the number and types of jobs utilizing

14

similar training, knowledge, skills or abilities, within

that geographical area, from which the individual is also

disqualified because of the impairment;" as well as the

number and types of other jobs not utilizing similar

training, knowledge, skills or abilities, within

geographical area, from which the individual is also

disqualified because of the impairment.

*Id.* (citing 29 C.F.R. § 1630.2(j)(3)(ii)). Qualitative evidence
of the local job market may be helpful, but is not necessary.
*Id.* at 197. Instead, "the issue of the employer's subjective
perception of the degree of [plaintiff's] impairments can be
addressed through circumstantial evidence, including inferences
based on the evidence of the employer's perceptions of
[plaintiff's] impairments." *Id.*

It is undisputed that defendant perceived plaintiff as
having an impairment and there is evidence suggesting that Dr.
Charbonneau considered the impairment to be permanent or long-
term. Dr. Charbonneau commented to Bond regarding Garr that "no
way is that guy going back to work." (Pl.'s Ex. G, at 32:17-23).
Garr was also pulled off of temporary productive work ("TPW").
Given that TPW is designed to get employees back to their jobs
within 30 to 60 days, the fact that Dr. Charbonneau removed Garr
from the program is evidence that he considered Garr to have a
long-term impairment.

But it is not enough to show that defendant subjectively perceived plaintiff has having a long-term or permanent impairment.  Plaintiff must also show that "the employer regarded him as facing restrictions that would be significant enough to restrict his ability to meet the requirements of a substantial class of other jobs, beyond his current job." *Miller*, 643 F.3d at 196.  Plaintiff has introduced evidence that defendant restricted Garr from work "in train service" and "safety sensitive work."  (Pl.'s Ex. G-11).  There remains a genuine dispute as to whether these two categories of work constitute a class of jobs.

       b.  Qualified individual

To survive summary judgment on his ADA claim, plaintiff must show "that he is a 'qualified individual,' *i.e.*, that he is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012) (quoting 42 U.S.C. § 12111(8)).  Defendant argues that Garr was not a qualified individual with a disability for two reasons, but neither is convincing.

First, defendant contends that Garr never met Union Pacific's qualification standards for locomotive engineers.  As defendant points out, "[u]nder the ADA, an employer can apply

16

'qualification standards' that deny a job to an individual with a disability as long as those standards are 'job-related and consistent with business necessity.'" *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000) (quoting 42 U.S.C. § 12113(a); 29 C.R.R. § 1630.15(b)(1)). Defendant argues that Union Pacific applied such a standard, namely, the DOT/FMCSA guidelines. According to defendant, because Garr did not meet, or did not provide medical information showing that he met, the cardiac standards set out in the DOT/FMCSA, Union Pacific was justified in not returning Garr to work.

Plaintiff counters that defendant never formally adopted the DOT/FMCSA guidelines for use in determining fitness for duty as an engineer. It is undisputed that defendant had in place Medical Rules for determining an employee's fitness to return to work in a safety-sensitive position following a cardiac event, though the Rules do not set forth a particular set of qualification standards. (Pl.'s Resp. to Def.'s SOF, at ¶ 10; Def.'s Ex. 7b, at 9). The Medical Rules themselves do not adopt the DOT/FMCSA guidelines. (*See* Def.'s Ex. 7b). Michael Reedy, General Chairman of the General Committee of Adjustment, United Transportation Union, recognized that defendant *could* "adopt the FMCSA standards and apply those standards to its workforce" but does not say that they did so. (Def.'s Ex. 2i).

17

Further, though the DOT/FMCSA guidelines would prohibit any employee with an ICD from operating a commercial motor vehicle (Def.'s Ex. 12e, at 10), it is undisputed that defendant allowed some employees with ICDs to return to safety-sensitive positions. (*See infra*, at p. 29-30). Defendant argues that this fact is evidence that it conducted individualized assessments, but this does not answer the question of how defendant applied (or did not apply) the guidelines to Garr or to other employees. So while defendant claims to have adopted the DOT/FMCSA guidelines, it has not established as a matter of law that it did so or that, if it did adopt the guidelines, it applied them in a uniform manner. I conclude that plaintiff has raised a genuine dispute as to whether defendant in fact adopted and uniformly applied the DOT/FMCSA guidelines as part of its process of determining when an employee is fit to return to a safety-sensitive position.

Defendant also argues that Garr was not qualified to perform the essential functions of the position because his condition was a direct threat to the safety of himself and others. "An individual is not qualified if he presents a 'direct threat' to his own health and safety or that of others." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657 (2005) (citing *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000)).

The determination that [an individual] poses a direct threat must be premised upon "a reasonable medical

judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002) (citing 29 C.F.R. § 1630.2(r) (internal quotations omitted)). The assessment should take into account: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r); *see also Chevron*, 536 U.S. at 86, 122 S.Ct. 2045; *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001).

*Darnell*, 417 F.3d at 660. A defendant moving for summary judgment bears the burden of showing "that the evidence on the question of direct threat is so one-sided no reasonable jury could find for [the non-moving party]." *Branham v. Snow*, 392 F.3d 896, 907 (7th Cir. 2004) (citing *Anderson*, 477 U.S. at 251-52, 106 S.Ct. 2505).

Defendant has failed to point to evidence in the record showing that it is entitled to judgment as a matter of law on the direct threat issue. Even as to some of the factors, such as the

19

second, that would appear to favor defendant's position, the evidence is not so one-sided that no reasonable jury could find for plaintiff. For instance, as to the third factor, defendant posits that Dr. Cytron indicated to Dr. Charbonneau that Garr had an 8-10% chance of sudden incapacitation. (Def.'s SOF, at ¶ 34). But during his deposition, Dr. Cytron disputed the accuracy of Dr. Charbonneau's recollection of their conversation. According to Dr. Cytron, the 8-10% figure applies to patients with ischemic cardiomyopathy but without the implantable defibrillator. (Pl.'s Ex. F, at 78). In other words, plaintiff has introduced evidence showing the ICD Garr had would have reduced his risk of sudden incapacitation from the 8-10% group.

But defendant also runs into another, more basic, problem. Plaintiff has introduced evidence showing that there are material disputes as to whether Dr. Charbonneau performed an "individualized assessment," whether the assessment (to the extent that there was one) was based on "objective, medical evidence," and whether Garr was compliant with his post-implantation therapies. To the extent that Dr. Charbonneau's October 14, 2008, e-mail to Bond might represent evidence of an "individualized assessment," it relies on disputed medical facts. The same goes for Dr. Charbonneau's September 24, 2008, e-mail to Bond, in which he purports to base his assessment of Garr in part on Garr's alleged failure to take his beta-blockers. Plaintiff

has pointed to evidence tending to show that he was compliant with his medications around the same time Dr. Charbonneau sent the e-mail to Bond.  (Pl.'s Resp. to Def.'s SOF, at ¶ 31; Pl.'s Ex. F, at 41, 43).  Further, Dr. Charbonneau's October 14, 2008, e-mail states that, regarding the risk assessment, Dr. Charbonneau's assessment did not represent the "final recommendation."  (Def.'s Ex. 7a).  Defendant has failed to identify any contemporaneous document explaining how Union Pacific reached its final decision.

Contrary to defendant's assertions, this case is not like *Darnell* or *Bekker*.  In *Darnell*, the defendant's doctor conducted a physical exam consisting of a urine glucose test and an interview.  417 F.3d at 659.  Based on the test and statements the plaintiff made during the exam, the defendant's doctor concluded that the plaintiff was not capable of performing the physical requirements of the job on account of his "uncontrolled diabetes mellitus."  *Id.*  The Seventh Circuit in *Darnell* relied on evidence that the plaintiff's diabetes was in fact uncontrolled in concluding that the opinion of the defendant's doctor was reasonable.  *Id.* at 661.  The court also found that the plaintiff's condition was a direct threat, noting that "[i]t is precisely his noncompliance, poor judgment, and admittedly high glucose levels that make it likely he would eventually experience a diabetic episode at [work]."  *Id.*

21

Similarly, in *Bekker* the Seventh Circuit agreed with the district court's conclusion that the plaintiff in that case posed a direct threat and was therefore not a "qualified individual." 229 F.3d at 670. As in *Darnell*, the plaintiff in *Bekker* suffered from an uncontrolled condition. The plaintiff, a doctor, smelled like alcohol on numerous occasions, according to the reports of patients and staff. The evidence revealed that the reports were increasing, and the district court found that the plaintiff's "drinking was of long duration with no clear end in sight." *Id.* at 668. The plaintiff was discharged after she refused to undergo treatment or to agree to other conditions of employment.

In both *Darnell* and *Bekker*, the plaintiffs suffered from uncontrolled conditions and were noncompliant with treatment or refused to undergo any treatment. Defendant here claims that Garr was noncompliant with his beta-blocker therapy, but the statements by Dr. Charbonneau to this effect are not supported by any medical documentation. (*See* Def.'s SOF, at ¶ 31; Def.'s Ex. 7a). As I mentioned above, plaintiff has submitted evidence from his medical record indicating that around the same time that Dr. Charbonneau claimed Garr was noncompliant, Dr. Cytron noted that Garr was taking his beta-blocker medication. (Pl.'s Resp. to Def.'s SOF, at ¶ 31; Pl.'s Ex. F, at 41, 43). On this record, I cannot determine, as a matter of law, that Garr was a direct threat.

22

c. Adverse employment action because of disability

Defendant argues that Garr did not suffer an adverse employment action, but it is undisputed that defendant refused to return Garr to his position, or to any position, after he had the ICD placed in September 2008. Defendant's argument is therefore a non-starter, and I conclude that plaintiff raised a genuine dispute as to whether he suffered an adverse employment action because of his disability.

*Nordhoff v. Johnson*, 81 Fed. Appx. 885 (7th Cir. 2003), is inapposite. In *Nordhoff*, the plaintiff brought a failure to accommodate claim. Here, by contrast, plaintiff charges that defendant discriminated against him when it refused to return him to his position as a locomotive engineer. It is undisputed that defendant placed restrictions on Garr, the result of which was to bar him from returning to his former job. "The definition of an adverse employment action is generous," and includes cases in which there is "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citing *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002)). The record indicates that summary judgment is not appropriate on this issue.

2. Pretext

Defendant posits that plaintiff cannot show that its reason
for refusing to return Garr to his position as a locomotive
engineer---namely, that Dr. Charbonneau determined that Garr was
not fit for duty---was pretext.  In the absence of direct
evidence, "a plaintiff may show pretext by presenting evidence
tending to prove that the employer's proffered reasons are
factually baseless, were not the actual motivation for the
discharge in question, or were insufficient to motivate the
[adverse employment action]."  *Nawrot v. CPC Int'l*, 277 F.3d 896,
906 (7th Cir. 2002) (internal quotation marks and citations
omitted); *see also Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732
(7th Cir. 2001) (citing *Lenoir v. Roll Coater, Inc.*, 13 F.3d
1130, 1133 (7th Cir. 1994)).  "But pretext requires more than a
showing that the decision was 'mistaken, ill considered or
foolish, [and] so long as [the employer] honestly believed those
reasons, pretext has not been shown.'"  *Nawrot*, 277 F.3d at 732
(quoting *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000)).

Defendant's argument that plaintiff has adduced no evidence
that could demonstrate pretext is unpersuasive, in large part due
to the analysis of the "qualified individual" issue above.  I
have already concluded that plaintiff has raised genuine disputes
for trial on two issues: Whether defendant adopted and uniformly
applied the DOT/FMCSA guidelines and whether defendant's reliance
on Dr. Charbonneau's assessment that Garr was a direct threat was

24

reasonable.  Both of these issues call into question whether defendant's refusal to return Garr to his former position on account that he was not fit for duty was merely pretext for discrimination on the basis of a perceived disability.

Two additional factors weigh against granting summary judgment on the issue of pretext.  First, it is undisputed that Garr's treating doctors released him on at least three occasions during the relevant time period.  On one occasion, Garr's cardiologist noted specifically that Garr's condition was at its "baseline" for the past 10 years.  Garr had worked as a locomotive engineer during those 10 years in spite of the fact that he suffered from serious cardiovascular disease.  Second, plaintiff has effectively disputed Dr. Charbonneau's purported reliance on the 8-10% figure as a reason for not returning Garr to his former position.  Whether this was a legitimate misunderstanding---that is, that Dr. Charbonneau genuinely believed that Dr. Cytron said that Garr had an 8-10% risk of sudden incapacitation---or whether Dr. Charbonneau used this figure as a pretext is an issue for the trier of fact that cannot be determined on this record at summary judgment.

Defendant's motion for summary judgment on plaintiff's discriminatory treatment claim under the ADA is denied.

C.  Failure to Accommodate Claim

In addition to claiming that he was terminated for discriminatory reasons, plaintiff attempts to raise a failure to accommodate claim for the first time in response to summary judgment. Defendant argues that plaintiff cannot now bring such a claim because it is beyond the scope of Garr's EEOC charge, which alleged only disparate treatment under the ADA. I agree. "[A] failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999) (citing *Weigel v. Target Stores*, 122 F.3d 461, 464 (7th Cir. 1997)). The two claims "are not like or reasonably related to one another." *Id.* The fact that he did not allege a failure to accommodate in either his EEOC charge or his complaint means that he cannot raise such a claim in response to defendant's motion for summary judgment.

D.  Title VII Claim

Plaintiff has not submitted any direct evidence of race discrimination and therefore must proceed under the burden-shifting indirect method. Under the indirect method, a plaintiff must first establish a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.

*Atanus v. Perry*, 520 F.3d 662, 672-73 (7th Cir. 2008) (describing the indirect method for proving race discrimination in a Title VII case). As in the ADA context, if a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant "to produce a legitimate, noninvidious reason for its actions." *Id.* at 672. If the defendant satisfies its burden of rebutting the prima facie case, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the defendants' reasons are false and a pretext for discrimination. *Id.*

Defendant does not dispute that Garr is a member of a protected class. As discussed above, it is also undisputed that defendant did not return plaintiff to his position as a locomotive engineer, and so plaintiff suffered an adverse employment action. The dispute with regards to plaintiff's Title VII claim centers on whether he met defendant's legitimate expectations and whether white employees were treated more favorably.

1. Employer's legitimate expectations

In evaluating whether an employer's expectations or qualification requirements are legitimate, the question is simply whether the employer had bona fide expectations, as a court does not "sit as a super-personnel department and will not second-guess an employer's policies that are facially legitimate."

*Jones v. Provena St. Joseph Med. Ctr.*, 234 F.3d 1273, 2000 WL

1477057, at *2 (7th Cir. 2000) (citing *Foster v. Arthur Anderson,*

*LLP*, 168 F.3d 1029 (7th Cir. 1999) (abrogated on other grounds)).

The inquiry into whether Garr met defendant's legitimate

expectations here collapses into the ADA qualified individual

analysis.  For the same reasons, and in particular the genuine

dispute regarding the DOT/FMCSA guidelines, plaintiff has raised

a question for trial on whether defendant's expectations were

legitimate and whether Garr met them.

2.  Similarly situated employees

"A similarly situated employee for purposes of proving

discrimination refers to employees who were directly comparable

to [the plaintiff] in all material respects."  *Brummett v.*

*Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)

(internal quotation marks and citations omitted).  "This normally

entails a showing that the two employees dealt with the same

supervisor, were subject to the same standards, and had engaged

in similar conduct without such differentiating or mitigating

circumstances as would distinguish their conduct or the

employer's treatment of them."  *Radue v. Kimberly–Clark Corp.,*

219 F.3d 612, 617–18 (7th Cir.2000).  However, "[t]he similarly

situated inquiry is 'a flexible one that considers all relevant

factors, the number of which depends on the context of the

case.'"  *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 551

(7th Cir. 2011) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir.2007)).

Plaintiff's expert, Dr. Coe, has introduced evidence of eight Caucasian locomotive engineers "with significant cardiovascular disease and congestive heart failure."[22] (Pl.'s SOF, at ¶ 60). Defendant argues that the eight individuals are dissimilar as a matter of law but has failed to support this contention both in its written materials and at oral argument. Defendant argues that the individuals without ICDs placed are not medically comparable to Garr, who has an ICD. The only evidence to support such a theory is the DOT/FMCSA guidelines, which treat cardiac patients with and without ICDs differently. A literal reading of the guidelines would automatically exclude employees with ICDs from operating a commercial motor vehicle, but defendant did not automatically exclude cardiac patients with ICDs from safety sensitive position. Defendant has not pointed to evidence showing that Union Pacific treated employees with cardiac conditions differently based on whether they had and ICD placed. Because the record shows that there is a genuine dispute as to whether cardiac patients with ICDs were evaluated according

---

[22] Plaintiff claims that there are ten comparators, but two of the individuals identified were never returned to work. These two employees cannot be similarly situated to Garr, or, if they are, they were treated no better than Garr allegedly was treated. In particular, plaintiff has not submitted sufficient evidence to support his contention that at least one of these individuals was not returned to work for other reasons.

to the same or similar standards as cardiac patients without ICDs, I cannot conclude, as a matter of law, that the employees without ICDs are not proper comparators.

Defendant makes a number of other arguments, but none are persuasive. While there is evidence that Garr experienced some ventricular arrhythmias, the record does not definitively indicate that the comparators did not experience any similar arrhythmias or that the recorded arrhythmias were medically significant. Also, for purposes of this motion, plaintiff has sufficiently rebutted defendant's claim that Garr was not compliant with his medication. Furthermore, while defendant argues that none of the comparators were returned to work with an EF at 15%, at least two of the comparators were returned to work with EFs measuring at 20%, well below the DOT/FMCSA guidelines and where Garr's EF measured as of September 30, 2008.

Finally, defendant's argument that the proposed comparators are dissimilar on account of the fact that their doctors were more forthcoming with information is not supported by the record evidence. The record does not indicate one way or another the responsiveness of the comparators' treating doctors, and, in any case, plaintiff has introduced evidence that his doctors were responsive to Union Pacific's requests during the relevant time period.

    3.  Pretext

Defendant has offered a legitimate, nondiscriminatory reason for not returning Garr to his positions as a locomotive engineer: It claims that Garr was medically unfit to return to work. As with a claim under the ADA, "[i]n order to show that the employer's stated, nondiscriminatory reason for firing him is pretextual, the plaintiff must present evidence suggesting that the employer is dissembling. . . . The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believes the reason it has offered to explain the [adverse employment action]." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011) (citation omitted).

Plaintiff has presented enough evidence of pretext in connection with his Title VII claim to avoid summary judgment. In fact, plaintiff's case for pretext on his racial discrimination claim is stronger than his ADA claim because, in addition to all the reasons I stated in connection with the ADA claim, Garr's comparator evidence further supports the argument that defendant may not have applied the DOT/FMCSA guidelines evenhandedly. Based on this evidence, a reasonable jury could conclude that defendant's stated reasons for not returning Garr to his former positions as a locomotive engineer were pretext.

E.  ADEA Claim

ADEA claims are analyzed under the same burden-shifting framework as Title VII claims. *See Atanus*, 520 F.3d at 672-73 (analyzing the plaintiff's Title VII and ADEA claims using the same test). Plaintiff essentially conceded his ADEA claim at oral argument by failing to point to any evidence that younger employees were treated more favorably than Garr. Counsel for plaintiff referred vaguely to an employee in his thirties who had been returned to work, but could not support this assertion with any reference to the record. None of the ten purported comparators were under forty. Thus, plaintiff has failed to carry his burden on summary judgment.

F.  State Claims

Plaintiff's state claims must be dismissed. It is undisputed that the IDHR dismissed Garr's claims on February 19, 2010. (Pl.'s Resp. to Def.'s SOF, ¶ 59). Plaintiff had 90 days from that date, or until May 20, 2010, to file his IHRA claims. 775 ILCS 5/7A-102(C)(4), (D)(3). Plaintiff did not file his complaint in the Circuit Court of Cook County until July 26, 2010, well after the May 20, 2010, deadline. Plaintiff attempts to rely on a November 30, 2009, letter that he received from the IDHR to establish July 26, 2010, as a deadline for filing his IHRA claims. The November 30, 2009, letter informed plaintiff that *if* the IDHR did not complete his case within 365 days of filing the charge, at that point he would have 90 days in which

32

to file a civil action in the appropriate court.  This letter was superseded by the February 19, 2010, dismissal, which stated that plaintiff had 90 days from February 19, 2010, in which to file a lawsuit.  (*See* Def.'s Ex. 3a).

IV.

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.  Plaintiff's claims under the ADEA and state law, are dismissed, but his ADA and Title VII claims survive summary judgment.

**ENTER ORDER:**

**Eaine E. Bucklo**
United States District Judge

Dated: January 4, 2013

33